UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| UNITED STATES OF AMERICA, | Case No. 3:15-cr-00070-MMD-WGC |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| JAYSON ALAN ROBBINS, | |
| Defendant. | |

I. **SUMMARY**

Defendant Jayson Alan Robbins ("Robbins") was allegedly found to be in possession of child pornography. Robbins was subsequently indicted on three counts: (1) Distribution of Child Pornography in violation of 18 U.S.C. § 2252(a)(2) and (b); (2) Receipt of Child Pornography in violation of 18 U.S.C. § 2252(a)(2) and (b); and (3) Possession of Child Pornography in violation of 18 U.S.C. § 2252(a)(5). (ECF No. 40.) Before the Court is Robbins' Motion to Suppress ("Motion") (ECF No. 28). The government filed a response (ECF No. 43) to which Robbins replied (ECF No. 47). The Court held an evidentiary hearing on December 29, 2016 ("Hearing"). (ECF No. 57.) For the reasons discussed herein, the Motion is granted.

II. **RELEVANT FACTUAL BACKGROUND**

The following facts are taken from the evidence presented at the Hearing as well as evidence accompanying the Motion. (ECF Nos. 28-1, 28-2, 28-3, 28-4.)

On September 15, 2015, local law enforcement officers served a state-issued search warrant at Robbins' apartment. After realizing that Robbins was not at home, Washoe County Detective Greg Sawyer ("Sawyer") and Federal Bureau of Investigation ("FBI") Agent Dave Hearn ("Hearn") proceeded to Robbins' place of employment, the Sears department store at Meadowood Mall, in hopes of finding him there. After entering the department store, Sawyer and Hearn approached an unidentified individual working in the store's personnel office to inquire whether Robbins was working. Both officers were dressed in plains clothes, Sawyer's detective badge was hanging around his neck, and neither officers' gun was visible. At that time, Robbins was in fact working his shift in the electronics department. According to Sawyer, Robbins entered the office at the same time as the two officers began to ask about Robbins' whereabouts. Sawyer and Hearn then asked Robbins if he minded speaking with them. Robbins agreed to do so and accompanied the officers into a secluded break room.

Once seated in the room, Sawyer — who primarily directed the conversation — began to question Robbins.[1]

**Question**: I'm Detective Sawyer with the sheriff's office. This is Agent Hearn with the FBI.

**Answer**: Okay.

**Question**: You know we did a search warrant on your house today. I'm sure you know what it's for, right? BitTorrent usage.

**Answer**: Oh.

**Question**: And just wanted to talk to you about why you did this. I mean, it's for child pornography. Okay? And there's always multiple sides to everybody's story. So we always want to talk to people that are involved in this just to get your side of the story, to make sure you're not the monster that everybody envisions as soon as they hear the words "child pornography." Right?

---

[1] Unless noted, all questions and statements were made by Detective Sawyer.

2

1   **Answer**: Right.

2   **Question**: Is that something you'd be willing to . . . would you like to talk to us
3   real [sic] quick?

4   **Answer**: I noticed there was a . . . I was on a website searching for movies.
5   Some things came up. I checked them out. And, uh . . .

6   **Question**: Okay. Well, it's more than that. We've been downloading from you.
7   You know how BitTorrent works, right? It's peer-to-peer software.

8   **Answer**: Right.

9   **Question**: So you download a file, and then you share with other people?

10  **Answer**: Right.

11  **Question**: Well, we've been downloading files from you, a lot of them over
12  almost a year now.

13  **Answer**: Oh.

14  **Question**: Okay. So it's more than just going to a website and visiting.

15  **Answer**: Right.

16  **Question**: So it's more than just that. And I do computer forensics and all that
17  stuff along with some of my other partners. So we know it's more involved. We
18  know a little bit more than just the, you know, guts and cache from the website or
19  whatever. Okay? What time were you supposed to start your shift?

20  **Answer**: I'm already on.

21  **Question**: Oh, okay. Let me see if I can get some basic info from you. First, I'm
22  sure you've seen [rustling sound] . . . Let's take care of some random stuff first.

23  **Answer**: Okay.

24  **Question**: It's just part of my job, what I've got to do.

25  **Agent Hearn**: And you're not under arrest right now. At least I want to make that
26  clear.

27  **Detective Sawyer**: No.

28  **Hearn**: This is just a process of getting to know [indiscernible].

    **Sawyer**: Right. If I can find it.

    [Radio communication background noise.]

    [Inaudible.]

    Well anyway, you have the right to remain silent. Anything you say can be used against you in a court of law. You have a right to an attorney. If you can't afford one, one will be provided for you free of change. Basic one is, if you decide to talk to us, at any point you can stop answering questions if you choose. Okay do you understand all that?

    **Answer**: I do.

(ECF No. 28-3 at 3-5.) From there, Sawyer asks Robbins some background questions. After several more minutes, Sawyer again reiterates that they have been downloading child pornography files from Robbins through the torrent program for about a year.

    **Question**: Okay. All right. Well, like I said, we've been downloading for almost a year now. And a lot of child pornography files — I think it was well over a hundred from your house. One of the things we like to find out is how did you get interested in this? How did it evolve.

    **Answer**: I've reported some into the website. But I've been trying to collect info, not physical. And, um, it was a site called Zonzie [sic].[2] Can I write it down? Zonzie. Let's see, Zonzie. It was actually a redirect. I think that's it. It might be that one. Zonzie, Zonzie.

    **Question**: And what's with this website?

    **Answer**: It's a torrent site. First I discovered movies. And then I saw what other people were downloading. And I started to click on things at random. And then I discovered some —

    **Question**: Child pornography files?

    **Answer**: Right.

---

[2] The written transcript of the interview contains this term. It is unclear if this is the accurate spelling.

4

> **Question**: Just so you know, part of —
>
> **Answer**: It's kind of rampant on there.
>
> **Question**: Part of the forensics that we do is — I don't know if you know, but all the uTorrent, BitTorrent, all that software maintains in its registry a list of search words that are used by the person when they're looking for files. Okay? So it's going to [it's going to show] that you entered "PTHC." Or it's going to show that you entered "2y-o," 3y-o," "4y-o," whatever it might be. Okay? So what search terms would you use?
>
> **Answer**: Search words I used was "PTHC."
>
> **Question**: All those, okay. So it's more of an honesty check too. And being truthful actually does assist. I'll write in my report, "Yes, he was truthful" or "No he was not."
>
> **Answer**: Okay. PTHC. Hussy. Hussy fan. What else?

(ECF No. 28-3 at 8-9.) The interview lasts roughly 90 minutes.[3] At the end of the interview, the officers inform Robbins that he is being arrested. The recording ends with Robbins asking the officers to make arrangements to safe keep his bicycle, which is parked outside the department store.

III. **DISCUSSION**

Fifty years ago, in *Miranda v. Arizona*, 384 U.S. 436, 439 (1966), the Supreme Court adopted certain procedural safeguards to ensure that an individual who is "subjected to custodial police interrogation . . . is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." Absent those safeguards, the government may not use statements obtained from a "custodial interrogation." *Id.* at 444. Those safeguards include the "now familiar *Miranda* warnings . . . or their equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (quoting *Miranda*, 384 U.S. at 479).

---

[3]Sawyer testified that part of that time involved them waiting for Robbins to figure out his passwords.

5

Robbins seeks to suppress his statements to Sawyer and Hearn. Robbins advances the following arguments: (1) he was in custody for purposes of *Miranda* while interrogated in the break room; (2) the *Miranda* warning provided by Sawyer was constitutionally inadequate under the Fifth and Sixth Amendments because the warning did not include or convey the right to consult with counsel before or during the questioning; and (3) even if the *Miranda* warning was adequate, Robbins' statements were coerced and thus involuntary. (ECF No. 28 at 4-13.) The government counters that Robbins was not in custody for purposes of *Miranda* and, moreover, that the *Miranda* warning was constitutionally adequate.[4] (ECF No. 43 at 12.) The Court agrees with Defendant that he was in custody for purposes of *Miranda* when questioned in the Sears break room and that the *Miranda* warning given to him was constitutionally inadequate. In light of this finding, the Court declines to address Robbins' third argument.

### A. Custodial Interrogation

The threshold questions for determining whether *Miranda* applies are: (1) was Robbins in custody when he was questioned before his formal arrest; and, (2) if Robbins was in custody, was he interrogated?

#### 1. Custody

To determine whether Robbins was in custody at any point prior to his formal arrest, the Court must determine whether a reasonable person in Robbins' circumstances would have believed he was free to terminate the interview and walk away. *See United States v. Barnes*, 713 F.3d 1200, 1204 (9th Cir. 2013). An individual is considered in custody when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994). In order to make this determination, the Court must consider what

---

[4]Robbins argues he was in custody for the duration of his interview while the government counters that he was not in custody. Neither party presents an alternative timeframe for finding Robbins in custody. The Court will therefore address only the arguments presented.

objective circumstances surrounded the interrogation, *Thompson v. Keohane*, 516 U.S. 99, 112 (1995), and must not focus on the subjective view of the officers or of the individual who has been questioned. *Stansbury*, 511 U.S. at 323.

The following factors are relevant to whether an individual is in custody: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002). Courts must base this analysis on a totality of the circumstances. *Stansbury*, 511 U.S. at 322. Other factors may be pertinent or dispositive of the ultimate determination of whether a reasonable person felt free to walk away from the interrogators. *Kim*, 292 F.3d at 974.

Robbins identifies a plethora of factors to argue that he was in custody during the entire time he was in the break room. These include the fact that: (1) he was "whisked away from his work"; (2) he was placed in a secluded area, away from others; (3) he was confronted by a self-identified detective and FBI agent; (4) he was confronted with evidence of his guilt; (5) the search warrant was of a particular nature; and (6) the detective "put on display his special police skills implying there [was] no hiding the truth, thus creating a no escape custodial atmosphere." (ECF No. 28 at 5.) In their response, the government points out that there is an absence of any meaningful application of these facts under the five-factor test outlined above. (See ECF No. 43 at 5.) The Court agrees and will therefore apply the five-factor test.

        a.    **Language Used to Summon the Individual**

The Ninth Circuit has found an interrogation to be non-custodial where the defendant "agreed to accompany" officers to a police station or to an interrogation room. *United States v. Bassignani*, 575 F.3d 879, 884 (9th Cir. 2009) (citing *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (internal quotation marks omitted)). The government contends that Robbins approached the officers, initiated the conversation with them, that the officers did not order Robbins to stand or sit, and that it

was Robbins who chose the break room as the place to talk. (ECF No. 43 at 6.) Robbins responds that he was "whisked" away by the officers, acquiescing to the officers "show of authority and complied with their directive to enter the [break] room." (ECF No 47 at 2, 3.) However, both of these descriptions are in tension with Sawyer's testimony at the Hearing. (ECF No. 57.) Sawyer testified that it appeared to be by chance that Robbins simultaneously entered the personnel office when they were asking for his whereabouts. Sawyer also failed to identify Robbins as the person who chose the break room as the place to talk.

Based on Sawyer's testimony, this Court finds that the officers did not summon Robbins, and that Robbins voluntarily agreed to speak with them. In *Bassignani*, which involves questioning in a similar context at the defendant's place of employment, the Ninth Circuit found that because the officers had approached the suspect at his place of employment, asked him if he would speak with them several times, and eventually instructed the suspect that he had to accompany them to an interrogation room, this weighed in favor of a finding of custody. *Bassignani*, 575 F.3d at 884. In contrast here, Robbins voluntarily agreed to accompany Sawyer and Hearn to the break room after being asked only once. The Court therefore finds that this first factor weighs in favor of finding that Robbins was not in custody.

### b. Extent to which Individual is Confronted with Evidence of His Guilt

The Ninth Circuit has found that a suspect is in custody when an interrogator adopts an aggressive, coercive, and deceptive tone, *United States v. Beraun-Panez*, 812 F.2d 578, 579 (9th Cir. 1987), and that a suspect is not in custody when the officers do not attempt to challenge the suspect's statements with other "known facts" that suggest his guilt and merely ask the suspect about the allegations, *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005). The government relies on *Bassignani* to argue that Sawyer and Hearn conducted the interview in an open and friendly tone. (ECF No. 43 at 7.) The government further contends that there was not much

questioning as to the allegations and that the conversation with Robbins focused on Robbins' passwords and encryption techniques. (*Id.*) Defendant argues that Sawyer "aggressively confronted" him from the outset of the interview, exercised "brute force" to get him to confess, and "condemned [Robbins] as a monster." (ECF No. 47 at 4, 5.) As with the first factor, the parties' competing versions of the facts do not reflect the evidence. Based on the audio and transcript of the interview as well as Sawyer's testimony at the Hearing, the Court disagrees with both parties' accounts of what happened.

In *Bassignani*, the Ninth Circuit found that two facts weighed against a finding that the suspect was in custody. First, the interrogator "merely asked" the suspect about the allegations, and, second, only once did the interrogator confront the suspect with evidence of his guilt. 575 F.3d at 885. By contrast, in *Kim*, the Ninth Circuit found that this factor weighed in favor of finding the suspect in custody based on several facts. First, Kim was likely aware that she was a suspect due to her prior interaction with police, the fact that the officers were searching her store, and the fact that earlier in the day an officer had come to her home. Second, during the conversation officers asked Kim pointed questions about her sources, customers, and where the proceeds from the sales had gone.

Here, Robbins was informed that a search warrant was being executed at his residence at the outset of the interview, he was confronted almost immediately with "known facts" demonstrating his guilt, and the officers repeatedly identified where Robbins was lying in order to corroborate already obtained information. In fact, within the first two minutes of the questioning, Sawyer pointed out that Robbins was lying:[5]

**Robbins**: I noticed there was a . . .I was on a website searching for movies. Some things came up. I checked them out. And, uh . .

///

---

[5] This was shortly after Sawyer told Robbins they wanted to talk to him about child pornography and hear his side of the story. (ECF No. 28-3 at 4.)

9

> **Sawyer**: Okay. Well, it's more than that. We've been downloading from you . . . we've been downloading files from you, a lot of them over almost a year now. . . So it's more than just going to a website and visiting.

(ECF No. 28-3 at 4.) By informing Robbins that they had been downloading files from him for over a year, Sawyer appears to suggest that they would be able to discern truths from lies:

> **Sawyer**: So you download a file, and then you share with other people?
>
> **Robbins**: Right.
>
> **Sawyers**: Well, we've been downloading files from you, a lot of them over almost a year now.
>
> **Answer**: Oh.

(*Id.*) Thus, within minutes of the questioning, Sawyer has already pointed out that they have been collecting evidence against Robbins for a year and that they know he did not stumble across some files as he is now claiming. In fact, when Robbins tried to say he randomly clicked on torrent files that wound up being child pornography, Sawyer points out that the torrent systems maintain a registry of search terms and will show that Robbins actually sought out child pornography with particular search terms. Having been confronted, Robbins then reveals one search term he used and Sawyer reminds Robbins that their conversation is a "truthful check." Robbins, perhaps realizing Sawyer is aware of other search terms that he used, expands and identifies other search terms he used to search for child pornography clips on the torrent system. (ECF No. 28-3 at 4-9.) A reasonable person in Robbins' position would have believed he was a criminal suspect by the time Sawyer confronted him about the search terms he used on torrent programs to find child pornography. (*See* ECF No. 28-3 at 8-9.)

While Sawyer and Hearn's tone was friendly, this case is distinguishable from *Bassignani* because Sawyer's questions were pointed and Robbins was confronted

///

///

numerous times when he was lying or failing to tell the whole truth.[6] The Court therefore finds that this factor weighs in favor of finding Robbins to be in custody.

### c. Physical Surroundings of the Interrogation

"[A]n interrogation that is conducted in familiar surroundings weighs against finding that the defendant [is] in custody." *Bassignani*, 575 F.3d at 885 (citing *United States v. Eide*, 875 F.3d 1429, 1437 (9th Cir. 1989)). However, the Ninth Circuit has found that even if the suspect is in a familiar environment, if she is isolated from the outside world or from the presence of others who are familiar to her — e.g., family members or friends — this neutralizes the familiarity of the location. *Id.* (citing *Kim*, 292 F.3d at 977).

In their response, the government contends that this factor does not weigh in favor of a finding of custody as the interview was conducted at Robbins' workplace and Robbins was not isolated from the outside world. (ECF No. 43 at 8.) They also point out that Robbins was not in a police-dominated atmosphere, as was the case in *Kim* where police officers took over total control of the suspect's store. *Id.* Defendant replies that because he was taken into a separate room while he was working to talk to a detective and an FBI agent, with the door shut, this amounted to a police-dominated atmosphere. (ECF No. 47 at 5-6.)

The Court finds that this factor is neutral in terms of determining whether Robbins was in custody. While the government is correct that like in *Bassignani*, Robbins was in a familiar place, this case is distinguishable insofar as people were not coming in and out of the break room consistently during the interview as they did in *Bassignani*. In fact,

---

[6]As another example of this confrontation, at another point occurring about fifteen minutes into the interview, Agent Hearn states that,
> "[T]he evidence is all going to be on the computer. And from our downloads already we already [sic] know what series you have, what things you've looked at. So this is kind of like a truthful check for you, and that's what we're looking for. We want you to be truthful."

The use of the phrase "truthful check" and words synonymous with confrontation were used frequently at the outset of the interview (EC No. 28-3 at 4, 9, 12, 13, 14, 15) in order for the officers to have Robbins confirm information they apparently already had in their possession or to compel him to confess and provide additional information.

an individual entered the Sears break room at one point during the interview and all questioning ceased until the individual left. Although the door to the break room was not locked and the officers had not taken over control of the department store as they did in *Kim*, Robbins was isolated from others, including his supervisor.

### d.  Duration

The government argues that because the conversation here was "just under 90 minutes" and because it was conducted in an open and friendly tone, this is distinguishable from the two-and-a-half-hour interview in *Bassignani*. (ECF No. 43 at 9.)

The Ninth Circuit has not delineated a bright line rule in terms of duration for finding a suspect to be in custody. However, it has found that a suspect is not in custody when he is interrogated for forty-five minutes, *Norris*, 428 F.3d at 911, or for even more than an hour, *Crawford*, 372 F.3d at 1052, but that a suspect may be found to be in custody when interrogated for forty-five to ninety minutes, *Kim*, 292 F.3d at 92.

Robbins' interview was not a brief inquiry but instead was a prolonged series of pointed questions, where the officers inquired into the type of child pornography Robbins possessed, how Robbins found and stored the pornography on his various devices, Robbins' initial interest in child pornography and whether he had other pedophilic tendencies, and Robbins' passwords to devices discovered during the search of his apartment. At the hearing, Sawyer admitted that they prolonged the interview to try to get as much information as they could from Robbins to confirm his statements and assess him as a person. The Court therefore finds that this factor weighs in favor of a finding that Robbins was in custody.

### e.  Pressure Exerted to Detain Individual

The Ninth Circuit has held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any point during the interview. *Bassignani*, 575 F.3d at 886. Furthermore, courts have found support for finding the individual to not be in custody where the suspect is told she will be free to leave at the end of questioning and in fact does leave.

The government argues that Robbins was not in custody because he was told he was free to refuse to answer questions and was not under arrest at the beginning of questioning, and because Robbins was not detained or pressured by the officers. (ECF No. 43 at 10.) However, the Court disagrees that Robbins was not pressured by the officers. In *Bassignani*, the Ninth Circuit specifically highlighted that the suspect was not pressured to confess. Here, Robbins was pressured at various points to be truthful and not to lie about already known or established facts. (*See* discussion *supra* at Sect. III(A)(1)(b).) Robbins was also not informed by either Sawyer or Hearn that he was free to leave at any time or that he would be free to leave at the end of the interview. Rather, a little over two minutes into the interview, the officers informed Robbins that he was "not under arrest right now" and that if he decided to stop answering questions he could do so. (ECF No. 28-3 at 5.) A reasonable person in Robbins' situation would likely think he was not free to leave the room once the officers established their knowledge of his guilt. Therefore, this Court finds that this factor weighs in favor of finding that Robbins was in custody.

In sum, the balance of the factors weighs in favor of a finding that Robbins was in custody when he was interviewed in the break room at Sears. A reasonable person in Robbins' circumstances would not have believed he was free to terminate the interview and leave.

**B.    Interrogation or its Functional Equivalent**

In their response, the government does not address the issue of whether the questioning of Robbins amounted to interrogation, but the government did highlight that much of the conversation revolved around the various passwords for Robbins' devices and how Robbins employed encryption techniques to hide evidence of child pornography (ECF No. 43 at 7.) Because the government stated that it does not seek to admit the passwords (ECF No. 57), the Court focuses on whether the other questions asked of Robbins amount to interrogation.

///

For purposes of *Miranda*, "interrogation" includes both express questioning as well as "any words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. at 301. The Supreme Court has held that "interrogation" encompasses even those questions that are routine in nature when they are designed to elicit incriminating testimony. *See Pennsylvania v. Muniz*, 496 U.S. 582, 610 (1990).

Here, the conversation and questioning of Robbins revolved around information related in some way to how Robbins became interested in child pornography, how he stored and hid the files from his live-in girlfriend, and what had motivated Robbins to download child pornography. Although at times some topics appeared unrelated to child pornography, Sawyer pointed out at the hearing that the questions were designed to elicit as much information from Robbins in order to aid the officers in corroborating the information they already had and in making their case. The questions were not wholly unrelated and outside the scope of their investigation. Therefore, the Court finds that the officers should have known that the questions they posed were reasonably likely to elicit an incriminating response from Robbins.

In sum, the Court finds Robbins was subjected to custodial interrogation so the constitutional safeguards of *Miranda* apply.

C. **Adequacy of *Miranda* Warnings**

1. **Legal Framework**

The *Miranda* warnings comprise four distinct warnings that a suspect must be informed of before being subjected to custodial interrogation. These include that: (1) the suspect has the right to remain silent; (2) anything the suspect says can be used against him in a court of law; (3) the suspect has the right to the presence of an attorney; and (4) if the suspect cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. *Florida v. Powell*, 559 U.S. 50 (2010). Whenever the constitutional adequacy of these warnings is called into question, the

court must determine whether the warnings provided to the suspect reasonably conveyed his rights. *California v. Prysock,* 453 U.S. 355, 361 (1981).

### 2. Scope of the Right to Counsel

Because Robbins contends he was not adequately informed of his right to counsel, his challenge goes to whether Sawyer's warning regarding Robbins' right to counsel reasonably conveyed the scope of that right. The Court agrees with Defendant that the warning did not reasonably convey Robbins' right to invoke the presence of counsel before or at any point during the interrogation.

In *Miranda*, the Supreme Court held that in giving a suspect the specific warning of the right to counsel, the warning must clearly inform the suspect that this right applies both to consultation with counsel before and during questioning and not solely at some future time. *Florida*, 559 U.S. at 60 (citing to *Miranda*, 384 U.S. at 471). While there is no exact language required under *Miranda* when issuing the warnings, the Supreme Court has held that a suspect must be informed of the scope of the right to counsel before custodial interrogation may begin. *See id.* Reviewing courts are not required, however, to examine each word used by law enforcement officers "as if it is construing a will or defining the terms of an easement." *Id.* (quoting *Duckworth v. Eagan,* 492 U.S. 195, 203 (1989)).

Sawyer informed Robbins that he had "a right to an attorney" and that if he "can't afford one, one *will* be provided for [him] free of charge." (ECF No. 28-3 at 5 (emphasis added).) This conveys prospective appointment of counsel and not that the right to counsel applies before or during questioning. By contrast, when conveying the warning regarding Robbins' right to remain silent, not only did Sawyer explain that Robbins had the right to remain silent, but he also expressed that Robbins could invoke that right at any time ("if you decide to talk to us, at any point you can stop answering questions if you choose"). (*Id.*) By doing so, Sawyer conveys that the right to remain silent is ongoing — that it can be waived and then later invoked. No such explanation was given with respect to the right to counsel. The warning regarding Robbins' right to counsel

merely suggests a general right and a future right to counsel if Robbins cannot afford one. The Supreme Court has found that a warning that makes reference to a right to counsel at a future point in time does not fully advise the suspect of his right to counsel before interrogation. *California v. Prysock*, 453 U.S. at 360. Moreover, by clarifying the scope of one right — the right to remain silent — and that it may be invoked at any time but conveying the other right — the right to counsel — in prospective terms (counsel "will be appointed"), Sawyer did not clearly convey to Robbins that his right to counsel could be invoked before or during their questioning of him. Accordingly, the Court finds that the *Miranda* warning given failed to adequately inform Robbins of his right to counsel.

It is the government's burden to show that Robbins waived his *Miranda* rights by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). Further, the government is required to establish that Robbins both voluntarily and knowingly waived his *Miranda* rights when he answered the officers' questions. *Berghuis v. Thompkins*, 560 U.S. 370, 371 (2010) ("Thompkins waived his right to remain silent when he knowingly and voluntarily made a statement to police"). A suspect "knowingly" waives his *Miranda* rights when he makes the decision with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 382-83 (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Because Robbins did not have full awareness of the scope of his right to counsel, the government has failed to establish that Robbins knowingly waived his right to counsel and to have that counsel present during the custodial interrogation.

IV. **CONCLUSION**

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

///

It is therefore ordered that Defendant's Motion to Suppress (ECF No. 28) is granted. Robbins' statements to Sawyer and Hearn during his interview are inadmissible at trial.

DATED THIS 17th day of January 2017.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE